# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| SABRINA ANN WALKER,<br><br>                    Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN, *in her capacity as Acting Commissioner of the Social Security Administration*,<br><br>                    Defendant. | **MEMORANDUM DECISION AND ORDER**<br><br><br>Case No.  1:12-cv-235-EJF<br><br>Magistrate Judge Evelyn J. Furse |

Plaintiff Sabrina Walker filed this action asking this Court[1] to reverse or remand the final agency decision denying her Social Security Income ("SSI") under Title XVI of the Social Security Act, *see* 42 U.S.C §§ 1381–1383f (2010).  The Administrative Law Judge ("ALJ") determined that Ms. Walker did not qualify as disabled within the meaning of the Social Security Act.  (Admin. R. Doc. 15, certified copy tr. of R. of admin. proceedings: Sabrina A. Walker (hereinafter "Tr. __").)  Based on the Court's careful consideration of the record, the parties' memoranda, and relevant legal authorities, the Court REVERSES the Commissioner's decision for failure to consider Ms. Walker's migraines a medically determinable impairment and therefore REMANDS for further evaluation of their impact on her Residual Functional Capacity.

---

[1] The parties consented to this Court's jurisdiction pursuant to 28 U.S.C. § 636(c).  (ECF No. 11.)

Therefore, this Court REMANDS for further proceedings consistent with this Memorandum

Decision and Order.[2]

## FACTUAL & PROCEDURAL HISTORY

In August 2009, Ms. Walker filed for SSI alleging an onset date of disability of January

1, 2007. (Tr. 15.) The Regional Commissioner denied Ms. Walker's claims on January 13,

2010, and again upon reconsideration on June 7, 2010. (*Id.*) At Ms. Walker's request, a hearing

before an ALJ took place on June 2, 2011 (the "Hearing"). (*Id.*) On June 17, 2011, the ALJ

issued a decision (the "Decision") denying Ms. Walker's claims. (Tr. 12–25.) On July 15, 2011,

Ms. Walker requested the Appeals Council review the ALJ's Decision. (Tr. 10–11.) The

Appeals Council denied Ms. Walker's request on September 11, 2012, (tr. 1–5), making the

ALJ's Decision the Commissioner's final decision for purposes of judicial review under 42

U.S.C. § 1383(c)(3). *See* 20 C.F.R. § 416.1481.

### I. Physical Impairments

Ms. Walker, born in October 1979, (tr. 106), claims she has chronic migraines and back

problems. (Tr. 134.)

On September 4, 2008, Ms. Walker complained of chronic low back pain and migraines

to Dr. Tyler Dixon. (Tr. 293.) Dr. Dixon prescribed Percocet, among other medications, for Ms.

Walker's pain and Imitrex for her migraines in particular. (Tr. 293–94.) On September 29,

2008, Dr. Dixon noted Imitrex helped Ms. Walker's migraines, which she complained of having

about three times per week. (Tr. 302.) During this visit Dr. Dixon opted not to provide Ms.

Walker a letter stating she could not work but agreed to write her a note modifying her work

---

[2] Pursuant to Civil Rule 7-1(f) of the Rules of Practice for the United States District Court for the District of Utah, the Court concludes it does not need oral argument and will determine the appeal on the basis of the written memoranda.

when she suffers migraines, permitting her to stand up and move around the workplace.  (Tr. 302, 304.)  In October 2008, Ms. Walker visited Dr. Dixon about her chronic back pain and migraines.  (Tr. 305.)  Dr. Dixon's notes indicate better control of her migraines with occasional use of Imitrex.  (*Id.*)

Ms. Walker visited Dr. Dixon in November 2008 stating Imitrex and Percocet no longer helped her migraines.  (Tr. 314.)  Dr. Dixon administered a Stadol and Phenergan injection to help treat her migraines and instructed her to come back in three months.  (Tr. 315.)

In December 2008, Ms. Walker again visited Dr. Dixon.  (Tr. 318.)  Dr. Dixon's notes indicate she was working and "walking every day."  (*Id.*)  Dr. Dixon's notes of a March 2009 visit state Ms. Walker's pain medication allowed her to function despite her back pain.  (Tr. 329.)  Dr. Dixon discussed tapering Ms. Walker's back-pain medications.  (Tr. 330.)  Ms. Walker had a follow-up visit with Dr. Dixon at the end of March at which she indicated her medication kept her migraines stable and ameliorated her back pain enough to perform two jobs and care for her children.  (Tr. 333.)

In June 2009, Dr. Dixon's notes indicate Ms. Walker's back pain symptoms had not progressed, and she could function.  (Tr. 349.)  Dr. Dixon also noted Ms. Walker's migraines appeared to respond well to Fioricet, although she did suffer rebound headaches.  (*Id.*)  The next month, on July 20, 2009, Ms. Walker visited Dr. Dixon to follow up after a migraine-induced visit to the emergency room the previous night.  (Tr. 354.)  Dr. Dixon believed Chantix, which Ms. Walker took to help her quit smoking, caused her recent migraines and provided an injection to treat the migraine.  (Tr. 355.)  On September 8, 2009, Dr. Dixon administered another injection for her migraines.  (Tr. 363.)  Dr. Dixon's notes of a December 2009 visit state that Lortab helped Ms. Walker's pain symptoms "very well," and she only needed Percocet

occasionally. (Tr. 452.) However, Ms. Walker then discontinued Lortab and switched back to Percocet to treat her chronic back pain. (Tr. 453.)

In February 2010, Dr. Dixon administered another migraine injection and refilled prescriptions for Ms. Walker's pain medications. (Tr. 465.) Dr. Dixon's notes of a March 2010 visit state that Ms. Walker's pain medications allow her to be "functional in activities of daily living and to be able to work and care for family." (Tr. 470.) In a letter dated June 28, 2010, Dr. Dixon stated he did "not think there is anything with [Ms. Walker's] health [that] should prevent her from performing her activities at work normally." (Tr. 522.)

In addition to her many visits to Dr. Dixon for treatment of her symptoms, Ms. Walker's migraines caused her to seek emergency medical treatment on a number of occasions. (*See* tr. 210–11, 240–43, 250–54, 259–61, 277–78, 284–86.)

On April 29, 2011, Ms. Walker had MRIs of her cervical spine and lumbar spine. (Tr. 616–18.) Dr. Robert Lamb's notes of Ms. Walker's cervical MRI indicate a small-to-moderate disc protrusion at C5-6 and mild disc bulge at C4-5. (Tr. 616–17.) Ms. Walker's lumbar MRI showed mild-to-moderate hypertrophic facet disease of her lumbar spine. (Tr. 618.)

## II. Mental Impairments

In 1994, Ms. Walker spent four days hospitalized at the Sutter Center for Psychiatry where doctors noted her history of post-traumatic stress disorder, borderline personality features, suicidal ideation, and two prior inpatient psychiatric admissions. (Tr. 527.) In 2003, Dr. Kurt Rifleman, M.D., diagnosed Ms. Walker with neurological disorder, panic/anxiety, and depression. (Tr. 197.) Dr. Rifleman recommended Ms. Walker receive a "thorough neurological evaluation & subsequent treatment." (*Id.*)

Notes from Ms. Walker's primary care physician, Dr. Dixon, include many references to Ms. Walker's mental health. A record of an August 2008 visit with Dr. Dixon includes depression in Ms. Walker's past medical history. (Tr. 287.) Dr. Dixon's notes from October and November 2008 also reference Ms. Walker's depression. (Tr. 306, 309.) In February 2009, Ms. Walker asked Dr. Dixon for depression medication, stating she "feel[s] down and hopeless most days and [has] a lack of interest in doing things that she used to like to do." (Tr. 325.) Dr. Dixon prescribed Wellbutrin. (Tr. 326.) In March 2009, Ms. Walker complained to Dr. Dixon of worse depression symptoms, for which Dr. Dixon increased the Wellbutrin dosage. (Tr. 333.) In June 2009, Dr. Dixon noted Ms. Walker's "Long-standing" anxiety issue and refilled her prescription for Ativan, an anti-anxiety medication. (Tr. 349–50.) Dr. Dixon refilled Ms. Walker's Ativan prescription in November 2009 finding her anxiety stable. (Tr. 376–77.) Later that month, Ms. Walker complained her anxiety had worsened and requested an increase to her Valium dosing. (Tr. 446.) On October 2, 2010, Dr. Dixon completed a Medical Source Statement. (Tr. 494–98.) With respect to Ms. Walker's mental health, Dr. Dixon checked boxes indicating Ms. Walker suffered "[g]eneralized persistent anxiety," "[a]nhedonia," and "[d]ifficulty concentrating or thinking." (*Id.* at 494.)

Dr. Craig K. Swaner, Ph.D., evaluated Ms. Walker on January 4, 2010, and created a psychological report as part of Ms. Walker's application for Social Security benefits. (Tr. 388–95.) Ms. Walker complained to Dr. Swaner of anxiety and panic attacks. (Tr. 389.) Ms. Walker told Dr. Swaner that due to her anxiety, she generally prefers to stay by herself, but she does have regular contact with a neighbor and attends church. (Tr. 391.) Dr. Swaner diagnosed Ms. Walker with panic disorder without agoraphobia and dependent personality disorder, among other things. (Tr. 394.)

In May 2011, Dr. Ralph Gant, Ph.D., evaluated Ms. Walker at the request of her attorney. (Tr. 643–60.)  Dr. Gant diagnosed Ms. Walker with chronic post-traumatic stress disorder, recurrent major depressive disorder with possible psychotic features, generalized anxiety disorder, panic disorder, and mild mental retardation.  (Tr. 653.)

### III. Work History

Ms. Walker has worked as a cashier, cook, file clerk, ticketing clerk, telemarketer, and in technical support.  (Tr. 143–49.)  Ms. Walker worked as a file clerk in a California dental office from August 1998 to September 1999.  (*Id.*)  Her job duties for this position required her to file paperwork, schedule and confirm patients' appointments, and manage patients' insurance billing. (Tr. 146.)  At the hearing, Ms. Walker stated that she sometimes had problems with scheduling appointments, because she would "get them backwards . . . [and] place them in spots where they shouldn't have been."  (Tr. 40.)

### STANDARD OF REVIEW

42 U.S.C. § 1383(c)(3) provides for judicial review of a final decision of the Commissioner of the Social Security Administration ("SSA").  The Court reviews the Commissioner's decision to determine whether the record as a whole contains substantial evidence in support of the Commissioner's factual findings and whether the SSA applied the correct legal standards.  42 U.S.C. §§ 405(g), 1383(c)(3); *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).  The Commissioner's findings shall stand if supported by substantial evidence. 42 U.S.C. §§ 405(g), 1383(c)(3).

Adequate, relevant evidence that a reasonable mind might accept to support a conclusion constitutes substantial evidence, and "[e]vidence is insubstantial if it is overwhelmingly

contradicted by other evidence." *O'Dell v. Shalala*, 44 F.3d 855, 858 (10th Cir. 1994).[3] The

standard "requires more than a scintilla, but less than a preponderance." *Lax*, 489 F.3d at 1084.

"Evidence is not substantial if it is overwhelmed by other evidence—particularly certain types of

evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but

mere conclusion." *Gossett v. Bowen*, 862 F.2d 802, 805 (10th Cir. 1988) (internal quotation

marks and citations omitted). Moreover, "[a] finding of 'no substantial evidence' will be found

only where there is a conspicuous absence of credible choices or no contrary medical evidence."

*Trimiar v. Sullivan*, 966 F.2d 1326, 1329 (10th Cir. 1992) (internal quotation marks and citations

omitted).

Although the reviewing court considers "whether the ALJ followed the specific rules of

law that must be followed in weighing particular types of evidence in disability cases," the court

"will not reweigh the evidence or substitute [its] judgment for the Commissioner's," *Lax*, 489

F.3d at 1084 (internal quotation marks and citations omitted), but "review only the *sufficiency* of

the evidence," *Oldham v. Astrue*, 509 F.3d 1254, 1257 (10th Cir. 2007) (emphasis in original).

The court does not have to accept the Commissioner's findings mechanically, but "examine the

record as a whole, including whatever in the record fairly detracts from the weight of the

[Commissioner's] decision and, on that basis, determine if the substantiality of the evidence test

has been met." *Glenn v. Shalala*, 21 F.3d 983, 984 (10th Cir. 1994) (internal quotation marks

and citation omitted). "'The possibility of drawing two inconsistent conclusions from the

evidence does not prevent an administrative agency's findings from being supported by

substantial evidence,'" and the court may not "'displace the agenc[y's] choice between two fairly

conflicting views, even though the court would justifiably have made a different choice had the

_____

[3] Courts apply the same analysis in determining disability under Title II and Title XVI. *See House v. Astrue*, 500 F.3d 741, 742 n.2 (8th Cir. 2007).

matter been before it de novo.'"  *Lax*, 489 F.3d at 1084 (quoting *Zoltanski v. FAA*, 372 F.3d 1195, 1200 (10th Cir. 2004)).

In addition to a lack of substantial evidence, the Court may reverse where the Commission uses the wrong legal standards or the Commissioner fails to demonstrate reliance on the correct legal standards.  *See Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994); *Thomson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993); *Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1047 (10th Cir. 1993).

## ANALYSIS

The Social Security Act ("Act") defines "disabled" individuals as anyone who "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).  Moreover, the Act considers an individual disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  *Id.* § 1382c(a)(3)(B).

In determining whether a claimant qualifies as disabled within the meaning of the Act, the SSA employs a five-part sequential evaluation.  *See* 20 C.F.R. § 416.920; *Williams v. Bowen*, 844 F.2d 748, 750–53 (10th Cir. 1988); *Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987).  The analysis evaluates whether:

    (1) The claimant presently engages in substantial gainful activity;
    (2) The claimant has medically severe physical or mental impairment or impairments that last for at least twelve months;

(3) The impairment is equivalent to one of the impairments listed in the appendix of the relevant disability regulation which preclude substantial gainful activity;

(4) The impairment prevents the claimant from performing his or her past work; and

(5) The claimant possesses a residual functional capacity to perform other work in the national economy considering his or her age, education, and work experience.

*See* 20 C.F.R. § 416.920. The claimant has the initial burden of establishing the disability in the first four steps. *Ray v. Bowen*, 865 F.2d 222, 224 (10th Cir. 1989). At step five, the burden shifts to the Commissioner to show the claimant retains the ability to perform other work existing in the national economy. *Id.*

The ALJ evaluated Ms. Walker's claim through step four, making the following findings of fact and conclusions of law:

1. "[Ms. Walker] has not engaged in substantial gainful activity since August 27, 2009, the application date (20 CFR 416.971 *et seq.*)." (Tr. 17.)

2. "[Ms. Walker] has the following severe impairments: (1) Chronic cervical and lumbar strain/sprain; (2) Anxiety disorder, also diagnosed as post-traumatic stress disorder and panic disorder; (3) Dependent personality disorder v. somatoform disorder; and (4) Learning disorder, NOS (20 CFR 416.920(c))." (*Id.*)

3. "[Ms. Walker] does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926)." (Tr. 18.)

4. "[Ms. Walker] has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except [she] has a moderate limitation in the ability to socially function, such that she is precluded from performing work in which public interaction is a primary job component; and has a moderate limitation in the ability to concentrate, such that she is unable to perform work which requires [her] to work for extended periods of time without brief opportunities for pause." (Tr. 19.)

5. "[Ms. Walker] is capable of performing past relevant work as a file clerk. This work does not require the performance of work-related activities precluded by [her] residual functional capacity (20 CFR 416.965)." (Tr. 24.)

6. "[Ms. Walker] has not been under a disability, as defined in the Social Security Act, since August 27, 2009, the date the application was filed (20 CFR 416.920(f))." (Tr. 25.)

In short, the ALJ concluded Ms. Walker did not possess an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, that she had the residual functional capacity to perform past relevant work as a file clerk, and that she had not been under a disability since she filed her application in August 2009. (Tr. 15–25.)

In support of her claim that this Court should reverse the Commissioner's decision, Ms. Walker argues the ALJ erred: (1) by not finding her migraine headaches constitute a severe impairment at step two; (2) by improperly evaluating her credibility; (3) by improperly determining her residual functional capacity; and (4) by improperly determining she could return to her past relevant work as a file clerk. The Court addresses each argument in turn.

## I. Rejection of Impairments at Step Two

Ms. Walker argues the ALJ erred at step two of the sequential evaluation process by not finding her migraine headaches constitute a severe impairment. (Pl.'s Br. 11, ECF No. 16.)

Step two of the sequential evaluation process requires the ALJ to decide whether the claimant has a severe medically determinable impairment. 20 C.F.R. § 416.920(a)(4)(ii). "A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by your statement of symptoms." 20 C.F.R. § 416.908; *see also* 20 C.F.R. § 416.928 (discussing symptoms, signs, and laboratory findings).

If the ALJ cannot so establish an impairment, the impairment does not constitute a medically determinable impairment. If the ALJ determines an impairment or combination of impairments qualifies as medically determinable, he must consider whether the impairment significantly limits a person's physical or mental ability to do basic work activities and thus qualifies as severe. 20 C.F.R. § 416.921(a). The Regulations define "basic work activities" as

"the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 416.921(b). Examples include walking, standing, seeing, hearing, speaking, understanding instructions, and use of judgment. (*Id.*) "[A]lthough a severe impairment must 'significantly limit an individual's physical or mental ability to do basic work activities,' 20 C.F.R. § 404.1521, [the Tenth Circuit has] held that this is a 'de minimus' showing at step two of the five-step process." *Grogan v. Barnhart*, 399 F.3d 1257, 1263 (10th Cir. 2005) (citations omitted) (discussing definition of "basic work activities" identical to definition under Title XVI, 20 C.F.R. § 416.921).

Here, the ALJ found at step two of the sequential evaluation process that Ms. Walker's migraines did not constitute a severe medically determinable impairment. (Tr. 17.) The ALJ noted that despite Ms. Walker's claims of severe migraines, an April 2011 brain MRI showed normal results. (Tr. 17, 613–14.) Noting the record contained no other diagnostic tests related to Ms. Walker's migraines, the ALJ concluded that because symptoms alone cannot establish a medically determinable impairment, Ms. Walker's migraines did not constitute a medically determinable impairment. (Tr. 17.)

Many courts have noted that migraines present a particular difficulty at step two. *See, e.g.*, *Groff v. Comm'r of Soc. Sec.*, No. 7:05-CV-54, 2008 WL 4104689, at *6–8 (N.D.N.Y. Sept. 3, 2008) (recognizing difficulty of objectively identifying migraines as medically determinable impairments); *Federman v. Chater*, No. 95 Civ. 2892 (LLS), 1996 WL 107291, at *2–3 (S.D.N.Y. Mar. 11, 1996) (same); *see also* *Abdon v. Astrue*, No. 10-96-GWU, 2010 WL 5391452, at *5 (E.D. Ky. Dec. 22, 2010) (noting difficulty of evaluating subjective allegations of pain stemming from migraines for purposes of evaluating pain in the context of determining the RFC); *McCormick v. Sec'y of Health & Human Servs.*, 666 F. Supp. 121, 123 (E.D. Mich. 1987) (noting "[migraine] headaches are not traced easily to an objective medical condition"), *aff'd*,

861 F.2d 998 (6th Cir. 1988). In *Groff*, the district court noted "the elusive task a doctor faces in diagnosing this impairment as there exists no objective clinical test which can corroborate the existence of migraines." *Groff*, 2008 WL 4104689, at *7–8. The *Groff* court cited medical literature noting

> [t]he cause [of a migraine] is unknown and the pathophysiology is not fully understood.... The mechanism for migraines is not well defined, but several triggers are recognized[, including] insomnia, barometric pressure change, and hunger.... Symptoms usually follow a pattern in each patient.... The patient may have attacks daily or only once every several months. Diagnosis is based on the symptom patterns when there is no evidence of intracranial pathologic changes. Migraine is more probable when the patient has a family history of migraine.... No diagnostic tests are useful, except to exclude other causes. Treatment depends on the frequency of attacks and the presence of comorbid illness. In general, treatment can be classified as prophylactic, abortive, or analgesic.

*Id.* (alteration in original) (quoting *The Merck Manual* 1376 (17th ed. 1999)). Thus, the *Groff* court found error at step two where the ALJ failed to consider the claimant's subjective complaints in finding the claimant's migraines did not constitute a severe medically determinable impairment. *Id.* at *8. Likewise, in *Federman*, the district court held that because no test exists for migraine headaches, the ALJ could not rely solely on the absence of objective evidence to support a finding that the claimant's migraines did not constitute a severe medically determinable impairment. *Federman*, 1996 WL 107291, at *2 (citations omitted).

Like *Groff*, 2008 WL 4104689, at *6–7, and *Federman*, 1996 WL 107291, at *2, the record here contains many references to Ms. Walker's complaints about migraine symptoms and the treatments prescribed by multiple doctors. Migraines appear in Ms. Walker's treatment history at least as early as 2003 when a doctor at the Health Clinics of Utah prescribed Inderal. (Tr. 199.) Ms. Walker's treating physician, Dr. Dixon, treated her for migraines over an extended period. In September 2008, Ms. Walker told Dr. Dixon she suffered migraines about three times per week. (Tr. 302.) Dr. Dixon noted she took Imitrex and Percocet for her

migraines, and he considered starting Ms. Walker on "controlling prophylactic migraine medicine" if the symptoms increased in severity or frequency. (*Id.*) In November 2008, Dr. Dixon administered a Stadol and Phenergan injection to help treat Ms. Walker's migraine symptoms. (Tr. 315.) In June 2009, Dr. Dixon noted Ms. Walker's migraines responded well to Fioricet but that she did suffer rebound headaches. (Tr. 349.) In February 2010, Dr. Dixon administered another migraine injection. (Tr. 465.)

In addition, the record contains documentation of multiple migraine-induced visits to the emergency room. (Tr. 210–11, 240–43, 250–54, 259–61, 277–78, 284–86.) In August 2008, Ms. Walker complained to doctors at the Ogden Regional Medical Center Emergency Department (the "Emergency Department") of an eight-day-old headache. (Tr. 284–86.) Ms. Walker stated that bright light, noise, and general movement worsened her symptoms. (Tr. 284.) Doctors treated what they considered a migraine with Imitrex and Valium and told her to follow-up with her regular doctor in five days. (Tr. 285–86.) In September 2008, Ms. Walker complained to doctors at the Emergency Department of a three-day-old headache. (Tr. 277.) The Emergency Department doctor on duty treated Ms. Walker's migraine with Macrobid. (Tr. 278.) Documentation from January 2009 shows emergency room doctors thought Ms. Walker had a migraine and treated her with Midrin. (Tr. 259–61.) In June 2009, doctors at the Emergency Department treated Ms. Walker for a migraine. (Tr. 250–54.) On July 20, 2009, Ms. Walker went to the emergency room complaining of a five-day-old migraine. (Tr. 210.) Dr. Jeremy Booth diagnosed Ms. Walker with chronic migraine headaches and administered Phenergan. (Tr. 211.)

Thus, given the extensive record of Ms. Walker's migraine symptoms, and the lengthy history of treatment from multiple sources, including the improvement of the migraines through

medical intervention, (*see, e.g.*, tr. 305, 333, 349), substantial evidence does not support the ALJ finding that Ms. Walker's migraines do not constitute a medically determinable impairment based solely on the absence of medical signs and laboratory findings. *See, e.g.*, *Groff*, 2008 WL 4104689, at *8 n.9 (noting "the ALJ's inappropriate reliance on the absence of objective evidence of [migraines] as there appears to be no set test which can establish the existence of this condition"). The ALJ should have also considered Ms. Walker's history of complaints and treatment and found the headaches a medically determinable impairment. *See id.* at *8 ("Dr. Peets consistently diagnosed Plaintiff with a migraine condition and treated him for such. Accordingly, the ALJ erred at Step Two when he determined the absence of a medically determinable severe impairment and, in turn, failed to consider Plaintiff's subjective complaints.") However, because the ALJ considers both severe and non-severe impairments at later steps, any failure to designate additional severe impairments at step two qualifies as harmless because the ALJ found other severe impairments and continued with the sequential evaluation process. *See Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008); *Brescia v. Astrue*, 287 F. App'x 626, 629 (10th Cir. 2008).

## II. Evaluation of Ms. Walker's Credibility

Ms. Walker next argues the ALJ did not properly evaluate her credibility. (Pl.'s Br. 12–14, ECF No. 16.) The Court disagrees.

"'Credibility determinations are peculiarly the province of the finder of fact, and [a court] will not upset such determinations when supported by substantial evidence.'" *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) (quoting *Diaz v. Sec'y of Health & Human Servs.*, 898 F.2d 774, 777 (10th Cir. 1990)). "However, '[f]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings.'"

*Id.* (quoting *Huston v. Bowen*, 838 F.2d 1125, 1133 (10th Cir. 1988)). If objective medical evidence shows a medical impairment that produces pain, the ALJ must consider the claimant's assertions of severe pain and decide the extent to which the ALJ believes the claimant's assertions. *Id.* (citation omitted). To do this, the ALJ should consider such factors as

> the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence.

*Id.* (citation and internal quotation marks omitted). But this analysis "does not require a formalistic factor-by-factor recitation of the evidence. So long as the ALJ sets forth the specific evidence he relies on in evaluating the claimant's credibility, the dictates of *Kepler* are satisfied." *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000).

The ALJ found one could reasonably expect Ms. Walker's medically determinable impairments to cause her alleged symptoms. (Tr. 20.) However, the ALJ found Ms. Walker's statements about the intensity, persistence, and limiting effects of her symptoms lacked credibility. (*Id.*) The ALJ provided many reasons for making this finding. (*See* tr. 20–23.) First, the ALJ found objective medical evidence did not support Ms. Walker's testimony. (Tr. 20.) For example, the ALJ noted that MRIs[4] of Ms. Walker's lumbar and cervical spine "support some moderate limitations in [Ms. Walker's] ability to lift and carry" but did not support the severity of the limitations Ms. Walker claimed. (*Id.*) The ALJ also noted that Ms. Walker's exam findings did not align with her allegations. (*Id.*) For example, the ALJ noted that while medical exams supported some limitations to Ms. Walker's ability to lift, Ms. Walker's normal

---

[4] The MRIs showed mild-to-moderate hypertrophic facet disease, a small-to-moderate protruding disc at C5-6, and mild disc bulge at C4-5. (Tr. 616–18.)

gait, normal strength, and negative straight leg raise results contradicted her allegations of difficulty standing and walking. (*Id.*) The ALJ also noted evidence of narcotic-seeking behavior. (*Id.* at 21.) For example, Dr. Dixon's notes indicate Ms. Walker abused medication, and he threatened to stop prescribing pain medication if she continued to misuse her medications. (Tr. 470.) Many of Dr. Dixon's notes identify "narcotic seeking behavior" under a "Problems" heading. (*E.g.*, tr. 448, 466.) Ms. Walker ultimately violated a "pain contract" with Dr. Dixon by seeking narcotics from other sources. (Tr. 21, 424.) He thereafter refused to treat Ms. Walker's pain. (Tr. 424.) An ALJ may properly consider drug-seeking behavior in evaluating a claimant's credibility. *See Poppa v. Astrue*, 569 F.3d 1167, 1172 (10th Cir. 2009) (noting ALJ properly considered claimant's drug-seeking behavior).

The ALJ also found insufficient evidence to support Ms. Walker's alleged mental impairments. (Tr. 21–22.) For example, the ALJ noted Ms. Walker did not seek specialized psychological treatment but relied only on medications. (Tr. 21.) The ALJ also noted that psychiatric exams administered by Ms. Walker's primary care physician all showed her to be appropriate, pleasant, with normal mood and behavior, and normal speech. (*See e.g.*, tr. 323, 325, 329.) Ms. Walker's activities of daily living also contradict her allegations of severe anxiety and concentration problems. For example, the ALJ noted Ms. Walker's testimony that she uses public transportation, attends church, and talks to neighbors contradicts her allegations of disabling anxiety, and her testimony that she pays her bills and handles her own savings/checking account contradicts her allegations of severe memory and concentration problems. (Tr. 22.)

Finally, the ALJ noted Ms. Walker's forgery conviction. (Tr. 22–23.) Because forgery generally requires specific intent to deceive, the ALJ found Ms. Walker's forgery conviction

reflected "very poorly on [her] propensity for truthfulness." (Tr. 23.) An ALJ may consider a

forgery conviction in analyzing a claimant's credibility. *See, e.g.*, *Simmons v. Massanari*, 264

F.3d 751, 756 (8th Cir. 2001) (noting forgery conviction detracts from claimant's credibility).

For the reasons set forth above, the Court finds substantial evidence supports the ALJ's

evaluation of Ms. Walker's credibility.

### III. RFC Consideration – Phase One

A claimant's residual functional capacity ("RFC") reflects the ability to do physical,

mental, and other work activities on a sustained basis despite limitations from the claimant's

impairments. *See* 20 C.F.R. § 416.945. The step-four analysis involves three phases:

> In the first phase, the ALJ must evaluate a claimant's physical and mental residual
> functional capacity (RFC), and in the second phase, he must determine the
> physical and mental demands of the claimant's past relevant work. In the final
> phase, the ALJ determines whether the claimant has the ability to meet the job
> demands found in phase two despite the mental and/or physical limitations found
> in phase one. At each of these phases, the ALJ must make specific findings.

*Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003) (citation omitted). In determining the

claimant's RFC, the decision maker considers all of the claimant's medically determinable

impairments, including those considered not "severe." *See* 20 C.F.R. § 416.945(a)(2).

Ms. Walker argues the ALJ erred at phase one because the Decision: (1) did not

sufficiently explain why substantial evidence supports Ms. Walker's residual functional capacity;

(2) did not discuss the "uncontroverted evidence not relied upon and the probative evidence he

rejected"; and (3) failed to consider Ms. Walker's non-severe impairments when evaluating her

residual functional capacity. (Pl.'s Br. 14–16, ECF No. 16.) The Court disagrees with all but the

last point.

The ALJ's determination of Ms. Walker's residual functional capacity includes ample

discussion and citations to evidence. The Decision's discussion of Ms. Walker's residual

functional capacity spans five pages and includes frequent citations to the record. (Tr. 19–24.) The Decision first sets forth Ms. Walker's testimony about her symptoms and discusses the ALJ's determination of Ms. Walker's credibility. (Tr. 19–21.) The Decision repeats that process with Ms. Walker's claimed mental impairments. (Tr. 21–22.) Both of these discussions include citations to record evidence. For example, in support of his finding that Ms. Walker's claims conflicted with exam findings, the ALJ cites to specific portions of five separate exhibits showing Ms. Walker's exams show normal strength, gait, sensation, and range of motion, among other things, contrary to Ms. Walker's claims. (*See* tr. 20.) As noted above, the Court finds substantial evidence supports the ALJ's determination of Ms. Walker's credibility.

The Decision then considered statements from third-party witness Bonnie Lehr, Ms. Walker's mother, and opinion evidence from the many doctors who examined or treated Ms. Walker. (Tr. 23–24.) Ms. Walker does not challenge the ALJ's findings regarding the persuasiveness of Ms. Lehr's testimony or the credibility of the doctors' opinions. Nonetheless, the ALJ's treatment of this evidence has relevance to Ms. Walker's argument that the ALJ did not adequately explain and support his determination of Ms. Walker's residual functional capacity. *See Poppa*, 569 F.3d at 1171 ("Since the purpose of the credibility evaluation is to help the ALJ assess a claimant's RFC, the ALJ's credibility and RFC determinations are inherently intertwined.") The ALJ provided reasons—supported by citations to the record—for according varying weights to these opinions. (Tr. 23–24.) For example, with regard to his decision to accord Dr. Dixon's opinion no weight, the ALJ noted inconsistencies in Dr. Dixon's opinions. (Tr. 24.) Although Dr. Dixon opined Ms. Walker could not work, the ALJ pointed to two letters Dr. Dixon wrote in June 2010 and April 2011. (*Id.*) In the June 2010 letter Dr. Dixon stated "I do not think there is anything with [Ms. Walker's] health [that] should prevent her from

performing her activities at work normally." (Tr. 522.) In the April 2011 letter Dr. Dixon cleared Ms. Walker to "return to work/school." (Tr. 504.)

Ms. Walker next argues the ALJ erred by not discussing the "uncontroverted evidence not relied upon and the probative evidence he rejected." (Pl.'s Br. 15, ECF No. 16.) But Ms. Walker does not identify what uncontroverted or probative evidence she refers to or where this evidence appears in the record. Neither does she provide any substantive analysis of this argument. "The court is not required to consider poorly developed arguments." *Cross v. Colvin*, No. 12-cv-01722-WYD, 2013 WL 5402056, at *2 (D. Colo. Sept. 26, 2013); *see also Anderson v. Colvin*, No. 12-cv-01282-REB, 2013 WL 3216140, at *3 n.3 (D. Colo. June 25, 2013) (declining to consider inadequately briefed and undeveloped arguments). Because the Court cannot identify the evidence Ms. Walker argues the Decision improperly ignores, the Court declines to consider this argument.

Finally, Ms. Walker argues the ALJ erred by not considering impairments the ALJ found not severe. (Pl.'s Br. 15–16, ECF No. 16.) Because the ALJ erred in not finding Ms. Walker's migraines a medically determinable impairment, he also erred by failing to consider her migraines at this step even if they do not rise to the level of severe. *See* 20 C.F.R. § 416.945(a)(2) (requiring consideration of all medically determinable impairments). For this reason the Court REMANDS for further analysis considering the impact of Ms. Walker's migraines on her RFC.

## IV. RFC Consideration – Phases Two & Three

Ms. Walker next argues the ALJ erred at phases two and three of the step-four analysis. (Pl.'s Br. 16–17, ECF No. 16.) Specifically, Ms. Walker argues the ALJ erred at phase two by not making any specific findings on the nature of Ms. Walker's past relevant work. As a result,

Ms. Walker argues the ALJ erred at phase three, because that step requires the ALJ to compare the phase-two findings with the residual functional capacity. The Court disagrees.

"At the second phase of the step four analysis, the ALJ must make findings regarding the physical and mental demands of the claimant's past relevant work." *Winfrey v. Chater*, 92 F.3d 1017, 1024 (10th Cir. 1996) (citing *Henrie v. U.S. Dep't of Health & Human Servs.*, 13 F.3d 359, 361 (10th Cir. 1993)). In determining the physical and mental demands of a claimant's past relevant work, the ALJ may look to the Dictionary of Occupational Titles ("DOT"). *See* 20 C.F.R. § 416.960(b)(2) ("We may use . . . other resources, such as the 'Dictionary of Occupational Titles' and its companion volumes and supplements . . . to obtain evidence we need to help us determine whether you can do your past relevant work, given your residual functional capacity."); *Parise v. Astrue*, 421 F. App'x 786, 789 (10th Cir. 2010) (finding reference to DOT number sufficient to establish physical and mental demands of past relevant work at phase two).

Here, the ALJ found Ms. Walker could perform past relevant work as a file clerk. (Tr. 24.) The Decision, however, did not provide a DOT number for the file clerk position identified by the ALJ. Nevertheless, the record clearly identifies this position as File Clerk I (clerical), DOT number 206.387-034. At the Hearing, the vocational expert characterized Ms. Walker's prior work, classifying her position as a file clerk at the California dental office as "file clerk I, light, SVP-3." (Tr. 46.) Although the vocational expert did not state the DOT number at the Hearing, and the ALJ did not provide the DOT number in the Decision, the position is readily identifiable based on the vocational expert's testimony.

Only one "File Clerk I" position appears in the DOT—DOT number 206.387-034. *See* DOT 206.387-034, 1991 WL 671737. The DOT classifies File Clerk I (clerical), DOT number 206.387-034, as light work with a specific vocational preparation (SVP) level of three. Thus,

because the Court can readily ascertain the position, the ALJ sufficiently referred to a specific job description for purposes of satisfying his burden to make findings on the physical and mental demands of Ms. Walker's past relevant work. *See McDonald v. Colvin*, No. 4:12CV1313SNLJ, 2013 WL 5406612, at *10 (E.D. Mo. Sept. 25, 2013) (finding ALJ sufficiently referred to a specific DOT job description where DOT entry was "readily ascertainable from the ALJ's description and as the sole entry of 'furniture mover' in the *DOT* index"); *see also Wright v. Astrue*, No. 1:12-CV-00014, 2013 WL 275993, at *3 (W.D. Va. Jan. 24, 2013) (refusing to find error where vocational expert either misstated DOT number or stenographer erroneously transcribed number).

The vocational expert also testified that a hypothetical individual with Ms. Walker's residual functional capacity could perform her prior work as a file clerk. (Tr. 46–47.) The ALJ cited the vocational expert's testimony in support of his own findings at phases two and three of the step-four analysis. (Tr. 24.) "An 'ALJ may rely on information supplied by the [vocational expert] at step four.'" *Doyal*, 331 F.3d at 761 (citation omitted).

> The ALJ found Ms. Walker had the residual functional capacity
>
> to perform light work as defined in 20 CFR 416.967(b) except [she] has a moderate limitation in the ability to socially function, such that she is precluded from performing work in which public interaction is a primary job component; and has a moderate limitation in the ability to concentrate, such that she is unable to perform work which requires [her] to work for extended periods of time without brief opportunities for pause.

(Tr. 19.) The DOT description of the File Clerk I position, in pertinent part, identifies the following job duties:

> Files records in alphabetical or numerical order, or according to subject matter or other system: Reads incoming material and sorts according to file system. Places cards, forms, microfiche, or other material in storage receptacle, such as file cabinet, drawer, or box. Locates and removes files upon request. Keeps records of material removed, stamps material received, traces missing files, and types

> indexing information on folders.  May verify accuracy of material to be filed.
> May enter information on records.  May examine microfilm and microfiche for
> legibility, using microfilm and microfiche viewers.  May color-code material to
> be filed to reduce filing errors.  May be designated according to subject matter
> filed, such as Change-of-Address Clerk (clerical); or according to material filed,
> such as File Clerk, Correspondence (clerical)

DOT 206.387-034, 1991 WL 671737.  Nothing in the File Clerk I DOT description conflicts

with the ALJ's determination of Ms. Walker's residual functional capacity.[5]  Looking at the

substance of what the ALJ actually did in the Decision, the ALJ complied with his obligations at

phases two and three of the step-four analysis.  *See Doyal*, 331 F.3d at 761 (noting "the form of

words should not obscure the substance of what the ALJ actually did").

Although the Decision could have more clearly set forth its findings on the physical and

mental demands of Ms. Walker's past relevant work, the Court finds substantial evidence

supports the ALJ's findings at phases two and three of the step-four analysis.

## CONCLUSION

Based on the foregoing, the Court finds that the ALJ erred at phase two of the step-four

analysis and REMANDS the Commissioner's decision in this case for further proceedings

consistent with this Memorandum Decision and Order.

DATED this 27th day of February, 2014.

BY THE COURT:

Evelyn J. Furse
United States Magistrate Judge

---

[5] The Court notes Ms. Walker's RFC may change on remand and makes no determination
of what the RFC should be on remand.